# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAMILLA KOCHENDERFER,<br><br>    Plaintiff,<br><br>vs.<br><br>RELIANCE STANDARD LIFE INSURANCE COMPANY, GROUP LONG TERM DISABILITY INSURANCE PLAN FOR ANESTHESIA SERVICE MEDICAL GROUP,<br><br>    Defendants. | CASE NO. 06-CV-620 JLS (NLS)<br><br>**ORDER: (1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. Nos. 50 & 51) |

Presently before the Court are the parties' Cross motions for summary judgment. (Doc. Nos. 50 ("Def.'s MSJ") & 51 ("Pl.'s MSJ").) Also before the Court are the parties' responses in opposition and replies. (Doc. Nos. 54 ("Opp. to Pl.'s MSJ"), 61 ("Opp. to Def.'s MSJ"), 64 ("Reply to Def.'s MSJ"), & 66 ("Reply to Pl.'s MSJ").) Having reviewed the parties' arguments, the administrative record, and the underlying law, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant's motion for summary judgment.[1]

//

---

[1] In its decision on this matter, the Court has considered and relied upon only admissible evidence.

**BACKGROUND**

Plaintiff Camilla Kochenderfer was a board certified anesthesiologist for twenty five years and employed by Anesthesia Services Medical Group from 1987 to 2000. (Administrative Record (AR) at 754.) Through her employment, Plaintiff was the beneficiary of a long term disability policy insured by Defendant. (*Id.* at 582–608.) She brings this case pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq,* alleging that Defendant is not paying her the disability benefits to which she is entitled. (*See, e.g.*, First Amended Complaint ¶¶ 1, 168.)

Plaintiff's policy provided benefits where she "(1) is Totally Disabled as the result of a Sickness or Injury covered by [the] Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability." (*Id.* at 597.) For the first thirty six months of disability the policy applied the "own occupation" standard, defining "Totally Disabled" as unable to "perform the material duties of his/her regular occupation." (*Id.* at 589.) Subsequently, the analysis shifted to an "any occupation" standard, where the insured was totally disabled if she could not "perform the material duties of any occupation" "that [her] education, training or experience will reasonably allow." (*Id.*)

Plaintiff suffers from degenerative arthritis in both hips. (*See, e.g.*, *id.* at 1163.) In November of 2000 Plaintiff had hip replacement surgery on her left hip.[2] (*Id.* at 751.) She filed for disability benefits following her surgery, which were awarded for the period of January 29, 2001 to May 4, 2001. (*Id.* at 634–35.) Defendant then decided that Plaintiff was not totally disabled. (*Id.* at 629–31.) It informed her of that decision on January 18, 2002. (*Id.*) Plaintiff appealed, providing additional documentary information which she believed bore on her ability to perform "the material duties of [her] regular occupation." (*Id.* at 568–74.) Defendant submitted these documents to Dr. Harold Markowitz, an orthopedic surgeon, for a "peer review." (AR at 948–72.) Dr. Markowitz concluded that Plaintiff was totally disabled under the "own occupation" standard. (*Id.* at 958.) Simultaneously, Defendant requested that Plaintiff submit to an "independent medical examination" (IME). (*Id.* at 547.) Plaintiff refused, offering several reasons, such as that the IME should have been conducted

---

[2] As of the ultimate denial of disability benefits, Plaintiff's right hip had not been replaced and remained severely arthritic.

prior to the initial denial, and that her claim was closed. (*Id.* at 521–22.) Nonetheless, Plaintiff's benefits were reinstated on October 23, 2002. (*Id.* at 511.)

In 2004, Plaintiff exited the "own occupation" disability period and entered the "any occupation" period. Defendant "invited Plaintiff to submit any medical or vocational information and included a Disability Review Questionnaire for her to complete." (Def.'s MSJ at 8 (citing AR at 476–79).) Plaintiff completed and submitted the questionnaire. Her answers set forth her day-to-day activities and generally reflected her belief she could not perform any occupation given her physical limitations. (AR at 831–41.)

While Plaintiff was gathering additional documentary information, Defendant used her medical records to perform a residual employability analysis to identify "occupations suitable for Plaintiff based on her physical limitations, education and work history." (Def's MSJ at 11.) First, a nurse, Barbara Finnegan, performed a "Medical/Vocational Review" of Plaintiff's medical records to determine Plaintiff's restrictions and limitations. (AR at 1135.) She concluded, based on the records provided, that Plaintiff would be capable of full time sedentary work where she had the ability to change position. (*Id.*) Next, this report was given to Jody Barach in order to create a "Transferrable Skills Analysis" report. (*Id.* at 1130–34.) Based solely on Ms. Finnegan's review, this report lists Plaintiff's education, training, and work history, states six "Transferrable Skills and Abilities," and finally offers "a representative list of (five) occupations that the claimant can perform based on her transferable skills and in consideration of her education, vocational experiences and medical limitations." (*Id.*) The occupations listed are classified as "Sedentary," because they require "Exerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."[3] (*Id.* at 1131)

Plaintiff subsequently submitted additional documents, including four of particular note. The

---

[3] According to Dr. Thrush, "The U.S. Department of Labor defines 'occasional' in terms of a work day; performing a particular activity or function up to 2–3 hours over the course of one work day." (AR at 829.)

1 first was a report of an examination by Dr. Richard Santore, the doctor responsible for her hip
2 replacement and follow-up care. (*Id.* at 914.) Dr. Santore noted that Plaintiff was "having pain at
3 rest" and "having difficulty sleeping at night." (*Id.*) He also stated that "[s]he was active quite a bit
4 out of town trying to take care of her mother with advancing stages of dementia in the Midwest." (*Id.*)
5 Regarding recent x-rays, the doctor reported "no evidence of an accelerated arthritic process" but
6 reiterated that Plaintiff "has unequivocal arthritis secondary to displasia manifested by subluxation
7 and narrowed joint space." (*Id.*) He concluded:

> There is no question that she will require a total hip replacement in the not too distant future. Given the relative stability, however, I am not recommending this at this time unless she were to insist upon it. She clearly has a disability which limits her to theoretical occupations that would include light work or semi-sedentary work only. Even working in an outpatient anesthesia environment would be too taxing for the hip. Executive type work could potentially be contemplated, as long as periods of standing and sitting could be modulated at her discretion.

12 (*Id.*)

13 Plaintiff's second notable document was a vocational assessment by Roger Thrush, Ph.D. (*Id.*
14 at 825–30.) Dr. Thrush's report discusses Plaintiff's restrictions and concludes that "Due to her
15 functional limitations, Dr. Kochenderfer absolutely could not carry out the material duties of <u>*any*</u> full-
16 time sedentary occupations and is certainly unable to perform the full range of sedentary work which
17 requires the ability to sit for prolonged periods of time throughout the day." (*Id.* at 826–27, 829
18 (emphasis in original).)

19 Third, Plaintiff submitted the results of a "functional capacity evaluation." (*Id.* at 332–37.)
20 The evaluation occurred over the course of two days and lasted three hours on each day. (*Id.* at 333.)
21 Plaintiff was able to complete all of the tasks required of her for the evaluation. (*Id.* at 336.)
22 However, the report noted that Plaintiff began the testing reporting a pain level of "2/10," but by the
23 end of the second day her pain had risen to a reported "7/10." (*Id.* at 336.) Plaintiff also felt the need
24 to subsequently take a Vicodin and spend the next day in bed. (*Id.*) Based on her substantial pain,
25 the report concluded that Plaintiff "does not currently have the capacity to work on either a part or full
26 time basis." (*Id.* at 337.)

27 The final document was a report by Dr. Santore from a February 17, 2004 examination. (*Id.*
28 at 915.) It notes Plaintiff's "considerably greater difficulty walking," "more pronounced limp on the

1  right side," and significant tendonitis of the right shoulder. (*Id.*) Further, Dr. Santore states that his
2  "comments of January 20th were overly optimistic" and that Plaintiff's condition would limit her to
3  jobs where she "could work from home or travel into an office at [her] discretion, could read reports
4  and make decisions in a comfortable sitting and/or lying position, could occasionally travel to visit
5  work sites, but could not stand or sit for prolonged uninterrupted periods of time." (*Id.*) He also notes
6  his agreement with Dr. Thrush's conclusions and his own lack of "understanding of the legal
7  implications of words that are used in medical reports." (*Id.*)

8  On March 12, 2004, Defendant informed Plaintiff that it was terminating her benefits based
9  on non-disability. (*Id.* at 418–20.) Plaintiff appealed this decision, submitting more than 350 pages
10 of additional records and information. As part of its consideration of this appeal, Defendant sent
11 Plaintiff's records to Dr. William Hauptman for review. (*Id.* at 898–908.) Dr. Hauptman concluded
12 that the medical records suggested that Plaintiff was capable of full time sedentary employment. (*Id.*
13 at 907.) He also recommended that Plaintiff undergo an IME. Plaintiff, however, again refused.
14 (Def's MSJ at 14–16.) Defendant also engaged a company to perform surveillance on Plaintiff. (*Id.*
15 at 13–14.)

16 During the course of the appeal, Plaintiff continued to submit further documentation to
17 Defendant, including statements by Dr. Santore and Dr. Thrush criticizing Dr. Hauptman's analysis
18 and conclusions. (AR at 316–24.) Dr. Hauptman reviewed these further submissions, but his opinion
19 remained unchanged. (*Id.* at 897.)

20 On March 7, 2005, Defendant denied Plaintiff's appeal, stating that Plaintiff had failed to meet
21 her burden of proof. (*Id.* at 2.) This suit was filed on March 21, 2006.

## LEGAL STANDARD

23 Summary judgment motions allow courts to identify and dispose of factually unsupported
24 claims. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323–24 (1986). Generally, such a motion may be
25 granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together
26 with the affidavits, if any, show that there is no genuine issue as to any material fact and that the
27 moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

28 In ERISA cases, however, the summary judgment analysis proceeds in a slightly different

manner. In reviewing these motions the Court must determine the appropriate standard of review, either de novo or deferential. This determination "should be 'guided by principles of trust law.'" *Metro. Life Ins. Co. v. Glenn*, — U.S. —, 128 S. Ct. 2343, 2347 (2008) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111–13 (1989)). That is, the Court "should analogize a plan administrator to the trustee of a common-law trust; and it should consider a benefit determination to be a fiduciary act (i.e., an act in which the administrator owes a special duty of loyalty to the plan beneficiaries)." *Id.* According to the Supreme Court, "[p]rinciples of trust law require courts to review a denial of plan benefits 'under a de novo standard' unless the plan provides to the contrary." *Id.* at 2348 (citing *Firestone*, 489 U.S. at 115). However, if the plan grants the administrator discretion in determining eligibility, "'[t]rust principles make a deferential standard of review appropriate.'" *Id.* (citing *Firestone* 489 U.S. at 111).

"[W]here the abuse of discretion standard applies in an ERISA benefits denial case, 'a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply.'" *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) (quoting *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999)). "An ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005) (citing *Bendixen*, 185 F.3d at 944). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993)). Courts should "uphold the decision of an ERISA plan administrator 'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.'" *Id.* (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th Cir.1997)).

Where deferential review is appropriate, if the administrator "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of

1  discretion." *Glenn*, 128 S. Ct. at 2357 (quoting *Firestone*, 489 U.S. at 115) (internal quotation marks
2  omitted). The Ninth Circuit has made clear that this weighing process is mandatory. *Nolan*, 551 F.3d
3  at 1154. In evaluating a conflict, the Court may consider evidence outside of the administrative
4  record. *See id.* at 1150. If the Plaintiff submits such evidence and raises the question of a conflict of
5  interest, the Court must "apply the traditional rules of summary judgment" to the conflict analysis.
6  *Id.* If there is a genuine dispute of material fact with regard to the issue of bias, the Court may not
7  weigh that evidence to determine the question of bias. *Id.* at 1154. A Court may resolve such issues
8  through an evidentiary hearing or a bench trial. *Id.*

## ANALYSIS

### I. Whether The Plan Afforded Defendant "Discretion"

The Court's first task is to determine the proper standard of review. It does so by examining Plaintiff's policy for language granting Defendant discretion in its claim determination. *Glenn*, 128 S. Ct. at 2348. The policy states: "The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits. . . . We shall serve as the claims review fiduciary with respect to the insurance policy and Plan." (AR at 593.)

The Court finds this language sufficient to confer discretion. The phrasing is explicit in detailing Defendant's "discretionary authority" and fiduciary role in claim determination. (*Id.*) Other courts, confronting similar discretionary clauses in an ERISA policy, have also found it adequate. *See, e.g.*, *Shemano-Krupp v. Mutual of Omaha Ins. Co.*, 2006 WL 3365595, at *6 (N.D. Cal. 2006); *Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1, 9 (1st Cir. 2009) (citing *Denmark v. Liberty Life Assurance Co. of Boston*, 481 F.3d 16, 29 (1st Cir. 2007)); *Walke v. Group Long Term Disability Ins.*, 256 F.3d 835, 839 (8th Cir. 2001). Therefore, the Court applies a deferential standard of review. *Glenn*, 128 S. Ct. at 2348 (quoting *Firestone*, 489 U.S. at 111).

### II. Conflict of Interest

Next, because Plaintiff has raised the issue, the Court must determine whether Defendant was operating under a conflict of interest. *Id.* As previously stated, in cases of deferential review if the administrator "is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 128 S. Ct. at 2348 (quoting *Firestone*,

489 U.S. at 115) (internal quotation marks omitted).

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest[4] is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial, fails adequately to investigate a claim or ask the plaintiff for necessary evidence, fails to credit a claimant's reliable evidence, or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 968–69 (9th Cir. 2006) (citations omitted). Further, "an inherent conflict of interest, even if merely formal and unaccompanied by indicia of bad faith or self-dealing, ought to have some effect on judicial review." *Id.* at 966.

Plaintiff takes issue with "*the process used* by [Defendant], and *the decision* it reached," arguing that this Court should adopt a high level of skepticism. (Pl.'s MSJ at 17 (emphasis in original).) The Court finds that Defendant's conflict requires a moderate level of skepticism regarding its denial of benefits.

### A. Structural Conflict of Interest

Both sides agree that Defendant operates under a "structural" conflict of interest. (Pl's MSJ at 9; Def's Opp at 13.) Therefore, the Court must review Defendant's denial of plaintiff's claim with at least a low level of skepticism.[5] *Abatie*, 458 F.3d at 965.

### B. Transferrable Skills Analysis Process

Plaintiff argues that more skepticism of this decision is necessary because Defendant failed to adequately investigate her claim. (Pl.'s MSJ at 5–6, 11–13.) In light of the information contained in the administrative record, the Court agrees.

First, the Court must conclude that the "Medical/Vocational Review" was inadequate. Nurse Finnegan neglected to consider at least one relevant medical document in Defendant's possession. The "Medical/Vocational Review" stated that the "Date of most current medical records" was

---

[4] Where the "insurer . . . acts as both the plan administrator and the funding source for benefits [it] operates under what may be termed a structural conflict of interest." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 965 (9th Cir. 2006).

[5] Plaintiff argues that this structural conflict of interest weighed particularly in the denial of her clam; that is, Defendant denied Plaintiff's claim for financial reasons. However, the Court does not reach this question because it is unnecessary to this Order's conclusion.

1 September 9, 2003.  At the time of the review, Defendant also was in possession of Dr. Santore's
2 "Attending Physician's Statement" (APS) dated October 3, 2003 and Plaintiff's answers to the
3 Disability Review Questionnaire submitted on January 16, 2004.  (*See* AR at 424, 1163.)  The report
4 also makes no mention of Plaintiff's medical restrictions noted in Dr. Santore's October 3 report[6] or
5 Plaintiff's self-reported limitations.  Failing to consider and include this information makes this an
6 incomplete and inadequate summary of the records in Defendant's possession.[7]

7 The "Transferrable Skills Analysis" presents a picture of even less diligence.  As Plaintiff
8 accurately notes, this document is highly conclusory.  It lists "transferrable skills and abilities," but
9 fails to state from where they were gleaned.  (AR at 1130.)  It offers a list of job titles but does not
10 explain the tasks performed in those jobs, what skills, training, or certification might be required, or
11 how Plaintiff is qualified.  (*Id.* at 1131.)  At best, this analysis is so opaque as to make it impossible
12 for the Court to evaluate its author's diligence.

13 More importantly, it provides no explanation of how Plaintiff's medical restrictions would not
14 interfere with her ability to "perform the material duties" of the listed occupations.  And, it is premised
15 on an incomplete summary of Plaintiff's medical records that does not reflect her medical or practical
16 limitations.  Without this information, the report lacks any meaningful use in determining whether
17 Plaintiff was disabled.  It is indicative of a failure to adequately investigate Plaintiff's claim.  *See*
18 *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361–62 (6th Cir. 2002) (criticizing this
19 type of report where the information sent to the evaluator was incomplete).

20 Given this combination of deficient process and incomplete information, the Court finds that
21 additional skepticism of Defendant's decision is required.

22 //
23 //

---

[6] "On the left, the total hip replacement restrictions include: no prolonged walking or standing (1–3 hour max. daily), no lifting of more than 20 lbs., no bending of the hip past 90°, no running, no jumping, no pushing or pulling of heavy objects, no crawling, no squatting past 90°, no use of ladders, no crossing of the legs at the knees, use of rails on stairs and use of padded shoe inserts." (AR at 1163.)

[7] Defendant defends this report by arguing that its use of a nurse is not evidence of bias. (Opp to Pl.'s MSJ at 15–16.)  The Court agrees that using a nurse does not show bias.  That, however, is irrelevant to the adequacy of the analysis.

### C.     Neutrality of Dr. William Hauptman

Another of Defendant's decisions indicating a conflict of interest was the retention of Dr. Hauptman to perform the review of Plaintiff's file on appeal. Although Dr. Hauptman is board certified in internal medicine and gastroenterology,[8] he is not a specialist in diagnosing or treating Plaintiff's particular condition: degenerative arthritis in her hips. (AR at 898.) He admits as much in his report, recommending that Defendant obtain "an independent orthopedic evaluation." (*Id.* at 907.) This stands in contrast to the medical review conducted when Plaintiff was denied "own occupation" benefits. At that time, Defendant retained Dr. Markowitz, an orthopedic specialist, who determined that Plaintiff was disabled under the applicable standard. (*Id.* at 948–72.)

The substance of Dr. Hauptman's opinion is also significantly limited because, among other things, it does not consider evidence such as Plaintiff's abnormal range of motion testing. Similarly, some of the report's conclusions are not unsupported. For example, Dr. Hauptman states that the "functional capacity examination" "indicate[s] on an objective basis" the capacity to work full time. (*Id.* at 906.) However, those tests lasted only three hours a day over the course of two days, Plaintiff's post-testing activities indicate that she would not have been able to continue for a third day, and Dr. Santore suggested that Plaintiff's decreased physical abilities may have, to some extent, been a result of those two days. (*id.* at 333, 336, & 915.) Further, Dr. Hauptman ascribes no weight to Plaintiff's reports of pain. (*Id.* at 906.) He notes her reported pain associated with her functional capacity examination, but significantly downplays its importance. (*Id.*) His also analysis essentially ignores the numerous limitations and difficulties described in Defendant's questionnaire answers. (*Id.* at 907.)

Notably, Defendant regularly retains Dr. Hauptman's services which gives him an incentive to outcomes in Defendant's favor. (*See, e.g.*, Pl.'s MSJ at 24 n.31; Opp. to Pl.'s MSJ at 15 n.8; *see also Gunn v. Reliance Standard Life Ins. Co.*, 592 F. Supp. 2d 1251, 1262 (C.D. Cal. 2008) ("the evidence reflects that Reliance used the services of Dr. Hauptman 167 times in 2003 and 110 times in 2004").) This is not the first time that Dr. Hauptman's neutrality has been questioned. A number

---

[8] Merriam-Webster OnLine defines "internal medicine" as "a branch of medicine that deals with the diagnosis and treatment of nonsurgical diseases." It defines "gastroenterology" as "a branch of medicine concerned with the structure, functions, diseases, and pathology of the stomach and intestines."

of cases made significant and critical remarks about his impartiality.[9] *See, e.g.*, *Gunn*, 592 F. Supp. 2d at 1261–62 ("[The plaintiff's] evidence that Reliance continued to rely on Dr. Hauptman's analysis after the *Conrad* court's criticism without addressing the substance of the Court's criticism is probative evidence that tends to show that Reliance acted in its own self interest in deciding to terminate Gunn's LTD benefits."); *Conrad v. Reliance Standard Life*, 292 F. Supp. 2d 233, 237–40 (D. Mass. 2003) ("Dr. Hauptman's two reports leave the impression of an examiner who has embarked on his investigation determined to find evidence that Conrad is not in as much pain, either physically or mentally, as he claims to be.").

Shifting from a specialist who sided with Plaintiff to a non-specialist raises questions about Defendant's bias in reviewing this claim. This is especially true where that non-specialist's opinion does not consider all of the evidence and the evidence actually considered does not support the conclusions drawn therefrom. And since Defendant was on notice of this bias issue based on prior judicial criticism, the Court finds that the use of Dr. Hauptman should also factor into its conflict of interest analysis.

### D. Conclusion

Having reviewed the evidence the Court concludes that it should apply a moderate level of skepticism to Defendant's claim denial based on its conflict of interest. Further, the Court finds that this is proper even when applying the traditional rules of summary judgment to facts outside of the administrative record. Although Defendant argues that this court "must deny both cross-motions and hold a bench trial," that is incorrect. A bench trial would only be necessary where there is a genuine dispute of material fact. Since Defendant has not presented any evidence which rebuts Plaintiff's evidence from outside the administrative record, no genuine dispute exists here. Therefore, a summary judgment decision is proper without further proceedings.

//
//
//

---

[9] As Defendant correctly points out, not all cases that mention Dr. Hauptman criticize his work. However, the Court has seen no cases that consider the doctor's qualifications or potential bias and nonetheless find his evaluation adequate.

**III.     Abuse of Discretion**

Having determined the proper degree of skepticism, the Court may look to whether Defendant abused its discretion in denying Plaintiff's claim.  To briefly restate the abuse of discretion analysis, "[a]n ERISA administrator abuses its discretion only if it (1) renders a decision without explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relies on clearly erroneous findings of fact." *Boyd*, 410 F.3d at 1178 (citing *Bendixen*, 185 F.3d at 944). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Concrete Pipe*, 508 U.S. at 622).  Courts should "uphold the decision of an ERISA plan administrator 'if it is based upon a reasonable interpretation of the plan's terms and was made in good faith.'" *Id.* (quoting *Estate of Shockley*, 130 F.3d at 405).  In this case, the Plaintiff argues that Defendant of abused its discretion by not rendering an explanation and relying on clearly erroneous findings of fact.

A.     Whether Defendant Rendered Its Decision Without Explanation

Plaintiff argues that Defendant never engaged in "meaningful communication" with her regarding her disability.  (Pl's MSJ at 6.)  This language arises from the Ninth Circuit's decision in *Booton v. Lockheed Medical Benefits Plan*, 110 F.3d 1461 (9th Cir. 1997).  There, the court considered the regulation setting requirements about information provided when a claim is denied. *Id.* at 1463.  It held that ERISA requires "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Id.* "If benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial; if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it." *Id.*

When Plaintiff's "any occupation" claim was denied, she received a letter from Defendant. (AR at 418–20.)  It explained her policies provisions and definitions regarding disability, describes her condition, and concludes that Plaintiff "should be capable of working full time in sedentary occupations." (AR at 418–19.)  Although this letter may not stand at the pinnacle of clarity, its content reasonably meets the standards set forth in *Boonton*.  It certainly is not the deliberate

ignorance and obfuscation presented in *Boonton*'s facts. *Boonton*, 110 F.3d at 1462–63. Moreover, there are many examples of communication between the parties on issues other than the denial of benefits. Thus, the Court finds that Defendant did not render its decision without explanation or fail to engage in meaningful dialog with Plaintiff.

B. <u>Whether Defendant Relied on Clearly Erroneous Findings of Fact</u>

"'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Boyd*, 410 F.3d at 1178 (quoting *Concrete Pipe*, 508 U.S. at 622). In this case, the relevant finding of fact at issue is that Plaintiff could perform a full-time sedentary occupation.[10] Further, and as previously stated, the Court applies a moderate amount of skepticism to Defendant's findings based on its structural conflict of interest and the other indicia of bias discussed in Part II, *supra*. The Court finds that this finding was clearly erroneous.

*1. Initial claim review*

With respect to the initial claim denial, Defendant relied on substantially inadequate evidence. Of all of the items then in the administrative record, the decision to deny benefits appears to be based on two. The first was Dr. Santore's statement that Plaintiff's theoretical occupations would be limited to "light work or semisedentary work only." (AR at 914.) For example, "[e]xecutive type work could potentially be contemplated, as long as periods of standing and sitting could be modulated at her discretion." (*Id.*) The second piece of evidence was the "Transferrable Skills Analysis" which claimed that Plaintiff is capable of sedentary work where she has the ability to change position. (*Id.* at 1130–32; *Id.* at 419.)

However, upon close examination the Court cannot say that either piece of evidence supports Defendant's position. As discussed above, the "Transferrable Skills Analysis" is highly problematic. Its determination relied exclusively on the flawed medical record summary, which omitted mention

---

[10] Defendant submitted additional evidence following the completion of briefing and oral argument on this matter. (*See* Doc. No. 73.) That evidence, however, is irrelevant for purposes of these motions. First, it is not part of the administrative record and does not bear on Defendant's conflict of interest. As such, the Court cannot consider this evidence in its disposition of the present motions. Second, even if the Court were to consider this evidence, writing a singe expert report does not establish that Plaintiff was not totally disabled under her policy.

of, *inter alia*, Plaintiff's medical restrictions and reports of pain. (*Id.* at 1135.) Without these key pieces of information, it would be impossible to determine whether or not Plaintiff could perform a particular occupation. When the Sixth Circuit confronted a similar, though arguably more egregious, situation, it held that reliance on an evaluation based on "cherry-picked" evidence constitutes an abuse of discretion. *Spangler*, 313 F.3d at 362. Further, the report contains no analysis that would allow this Court to conclude that its conclusions are reasonable or even plausible. It also fails to consider the policy definition of total disability. Given the deficient foundation upon which the report is based and the lack of support for its conclusions, it was unreasonable for Defendant to rely on the "Transferrable Skills Analysis" in its claim determination.

Similarly, Dr. Santore's statement about Plaintiff performing "executive type work" only supports Defendant when taken in isolation from his later statements. Examining Plaintiff less than a month after his January 2004 comments, Dr. Santore found that Plaintiff had "Developed a significant tendonitis of the right should that may have in fact been initiated by some of" the activities during the Functional Capacity Examination. (*Id.* at 915.) In light of this new malady, he noted that his prior assessment had been "overly optimistic." (*Id.*) Dr. Santore described the "executive" type work he envisioned as allowing Plaintiff to "work from home or travel into an office at [her] discretion, . . . read reports and make decisions in a comfortable sitting and/or lying position, . . . occasionally travel to visit work sites, but . . . not stand or sit for prolonged uninterrupted periods of time." (*Id.*) He further expressed his "agreement with [Dr. Thrush's] comments with regard to employability." (*Id.*)

These conclusions are consonant with those in the January 2004 report. They clarify Dr. Santore's vision of the types of work possible. To the extent that they add additional restrictions, that is attributable to the tendonitis developed following the Functional Capacity Examination. (*Id.*) As such, it is clear that Dr. Santore did not believe that Plaintiff could perform "sedentary" work because that would require Plaintiff to "sit[] most of the time." (*Id.* at 1131.) This is also supported by his agreement with Dr. Thrush, who found that "Due to her functional limitations, Dr. Kochenderfer absolutely could not carry out the material duties of <u>any</u> full-time sedentary occupations and is certainly unable to perform the full range of sedentary work which requires the ability to sit for

prolonged periods of time throughout the day." (AR at 829 (emphasis in original).) Taking Plaintiff's doctor's statement in isolation was unreasonable and indicates that Defendant abused its discretion.

Most of the evidence before Defendant supported Plaintiff's claim of disability. Dr. Santore's reports consistently support Plaintiff's disability. For example, his September 9, 2003 report states that Plaintiff has "significantly increased pain on the right side," "moderate arthritis superimposed on underlying dysplasia," "slightly increased stiffness of right hip," and reduced flexibility. (*Id.* at 1194.) His October 3, 2003 adds that Plaintiff has "decreasing range of motion, loss of cartilage space in the superolateral zone," and that her "symptoms on the right include increasing levels of pain in the hip and groin after one hour of walking or standing daily, decreased range of motion, painful clicking, increased stiffness, pain at rest, and limping on the right." (*Id.* at 1163.) The January 20, 2004 report reinforces these symptoms stating that Plaintiff had "increasing pain in the right hip," "pain at rest," "difficulty sleeping," "much more pain than she did six months ago," and "pain in one area in the greater trochanteric posterior region when she sits more than an hour." Further, Plaintiff's objective measures of flexibility were lower than when examined in September of 2003 and she "has unequivocal arthritis secondary to displasia." (*Id.* at 914.) Finally, the medical diagnosis from February 17, 2004 is also consistent indicating Plaintiff was having "considerably greater difficulty walking," and demonstrating a "more pronounced limp." (*Id.* at 915.) Although Dr. Santore's opinion is not entitled to any special weight in determining whether benefits are due, he was the only doctor to render an opinion on Plaintiff's health prior to the initial benefits determination. *Nord*, 538 U.S. at 834.

Both the Functional Capacity Evaluation and Vocational Rehabilitation Evaluation[11] conflict with Defendant's decision, concluding that Plaintiff does not have the capacity to perform the material duties of a sedentary occupation on a full time basis. (AR at 1124 & 1143.) At the Functional

---

[11] Defendant complains that the Vocational Rehabilitation Evaluation "report is merely a list of Plaintiff's 'reported' painful symptoms and the impact her reported pain would theoretically have on her employability, with no objective findings or basis for her pain." (Def.'s MSJ at 9.) This is incorrect; the report includes Plaintiff's medical diagnosis as well as her reported pain. (*See, e.g.*, AR at 826.) Regardless, its conclusions cannot simply be dismissed because it relies on Plaintiff's reported symptoms. Subjective reports of pain are relevant to whether a person is totally disabled under the policy's terms. *See Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 872 (9th Cir. 2008) (noting the potential relevance of subjective pain to a claimant's ability to work).

Capacity Evaluation Plaintiff's tolerances for sitting, standing, and walking decreased to the point where only brief periods of each were tolerable. Simultaneously her pain substantially increased. This occurred after only two consecutive days requiring three hours of work each. Nothing in the administrative record indicates that either of these reports was given any consideration by Defendant during the initial claim denial.[12]

Finally, Plaintiff's reports of pain cut strongly against Defendant's conclusion. She consistently reported substantial pain from common activities such as sitting and standing. Plaintiff's stated tolerances for sitting are "usually for less than an hour at a time, at the most about 2 hours, and its (sic) best if I can get up intermittently-every 30 minutes or so, and stroll slowly around, or lie down." (*Id.* at 836.) She claims that she "start[s] experiencing discomfort even after only 30 minutes sitting." (*Id.* at 838.) For standing, she can only endure "30 minutes to 1 hour before pain becomes significant and limiting," though "on a *very rare occasion*," she could stand or walk for up to 2 hours. (*Id.* at 837 (emphasis in original).) According to her, "*such rare attempts result in excruciating discomfort.*" (*Id.* (emphasis in original).) These reports of pain are relevant to whether Plaintiff could perform the demands of a particular occupation. Moreover, "pain is a completely subjective phenomena" and may "not [be] easily determined by reference to objective measurements." *Saffon*, 522 F.3d at 872; *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989). In this case, there is no evidence that Plaintiff's pain was ever considered during the initial claim denial. Failure to consider this important evidence was arbitrary and capricious.

Considering the entire administrative record in this case, the Court "'is left with the definite and firm conviction that a mistake has been committed'" during the initial claim denial. *Boyd*, 410 F.3d at 1178 (quoting *Concrete Pipe*, 508 U.S. at 622). The evidence on which Defendant relied to support its position was substantially flawed and overwhelmingly outweighed by evidence to the contrary. Therefore, the Court finds that Defendant abused its discretion in denying the initial claim.

//

//

---

[12] Although the record contains a document signed by Jody Barach stating that she had reviewed the Vocational Rehabilitation Evaluation, it is dated well after the initial denial. (AR at 821.)

*2.   Denial of Plaintiff's administrative appeal*

Defendant's denial of Plaintiff's appeal is also substantially deficient. Besides the evidence relevant to Plaintiff's initial denial, Defendant cites two new pieces of evidence in support of the appeal denial. (Def.'s MSJ at 12–14.) It also claims that its termination of benefits was reasonable "based on Plaintiff's refusal to cooperate." (Opp. to Pl.'s MSJ at 17.) Even with these additional facts, the Court finds Defendant acted arbitrarily and capriciously in denying Plaintiff's appeal.

Defendant contends that its decision to deny Plaintiff's appeal is supported by reports regarding surreptitious surveillance of Plaintiff's activity.[13] (Def.'s MSJ at 13–14.) An outside company engaged by Defendant recorded this video over the course of four days in late October, 2004. (AR at 657 & 664.) In total, the surveillance company recorded about nine minutes of Plaintiff's activity. Their report states that Plaintiff "was videotaped walking, carrying trash, and bending at the waist to pick leaves off the hood of her vehicle. [She] moved in a smooth, fluid manner without exhibiting any external signs of impairment or physical restriction. No visible braces, supports or orthopedic devices were observed." (AR at 666.) The surveillance company further informed Defendant that on another day Plaintiff "was observed walking outside the residence wit ha (sic) poker, using it to pick up pieces of newspaper." (AR at 671.)

However, this surveillance information provides little support to Defendant's decision. Its findings are consistent with Plaintiff's claims of disability. Plaintiff does not claim that she cannot walk, carry objects, or bend at the waist. (*See, e.g.*, AR at 833 (listing sitting, standing and walking among her "movements during the day" and noting that she is "limited to a hip angle of greater than 90 degrees").) Nor was Plaintiff observed walking or sitting for an extended period of time. These surveillance reports also do not indicate that Plaintiff could "perform the material duties of any occupation" "that [her] education, training or experience will reasonably allow." (*Id.* at 589.)

Defendant also relies on the report from Dr. Hauptman's independent review. (Def.'s MSJ at 24.) However, the Court finds that this report also cannot sustain Defendant's denial of Plaintiff's claim. Although "a single persuasive medical opinion may constitute substantial evidence upon which

---

[13] Although Plaintiff has provided the Court with a copy of the surveillance footage, it is not considered here as it was not before Defendant at the time of its disposition of Plaintiff's appeal. (*See* Horner Decl., Exs. 2 & 6.)

a plan administrator may rely in adjudicating a claim," Dr. Hauptman's opinion is both unpersuasive and not "substantial evidence." *Boyd*, 410 F.3d at 1179. This is because, as discussed above, the report suffers from some substantial flaws which raise questions about its accuracy and usefulness. (*See* Section II(C), *supra*.) Those defects include a failure to consider all of the evidence, arriving at conclusions unsupported by the evidence, and a failure to ascribe weight to Plaintiff's pain. Given these substantial flaws, it is difficult to characterize Dr. Hauptman's opinion as "persuasive." Notably, Defendant was aware of these flaws because Plaintiff sent them criticisms by Dr. Santore and Dr. Thrush.[14] (AR at 316–17, 319–24.)

Moreover, Dr. Hauptman concluded that Plaintiff's records *suggested* the possibility that she is capable of full time sedentary work, so long as she could change positions as necessary. As such, the report is not, and does not purport to be, conclusive. It clearly states that "The possibility for full time sedentary work is suggested, rather than definitively supported." (AR at 906.) Given the report's internal disclaimer of certainty, Defendant's attempt to rely on it as conclusive is unpersuasive. (*See* Def.'s MSJ at 24 (characterizing the report as Dr. Hauptman's opinion "that Plaintiff is not totally disabled").)

Further, as previously mentioned, Defendant declined to retain a specialist to engage in this records review. During Plaintiff's previous appeal Defendants had done precisely this. By replacing the specialist who supported Plaintiff's claim with a generalist whose neutrality has been criticized by courts, Defendant created the appearance of opinion shopping. Looking at the Hauptman report with moderate skepticism, the Court concludes that Defendant's reliance on it to deny Plaintiff's was arbitrary and capricious because it is an inadequate basis for finding that Plaintiff is not totally disabled under her policy.

Finally, Defendant relies on Plaintiff's refusal to undergo an "Independent Medical Examination." (IME) Plaintiff's policy provided that Defendant had "the right to have an Insured examined to determine the existence of any Total Disability which is the basis for a claim. This right may be used when and as often as it is reasonably required while a claim is pending." (AR 593.) The

---

[14] Although Dr. Hauptman disagreed with these criticisms, he does not further explain his position as set forth in the report or even discuss why he disagrees with Drs. Santore and Thrush. (AR at 897.)

policy, however, does not contain a definition of "pending" and does not state any consequences for failure to undergo an IME upon demand. Plaintiff refused the IME request and argues that her claim was not pending at that time. The Court disagrees. The Court finds that a claim is pending under this policy when it remains under some level consideration, even consideration of an appeal. Thus, Plaintiff's claim was pending while it was under review on appeal.

Nonetheless, this refusal does not justify Defendant's finding of non-disability. Since the examination was never conducted, it presents no evidence regarding whether Plaintiff was or was not actually disabled. Thus whether Defendant abused its discretion must be assessed on the other evidence in the administrative record.

Further, the Court cannot find that refusing to undergo the IME constituted a breach of contract or a failure to exhaust administrative remedies. Defendant's final letter of denial stated that "in declining to undergo the IME" Plaintiff had "failed to meet the burden of proof mandated by her policy." (AR at 2.) It did not assert that Plaintiff's claim was being terminated under a breach of contract theory. Thus, the Court does not consider it here.

That final denial letter also stated that "Dr. Kochenderfer has exhausted any administrative remedies available." (AR at 2.) Thus, although some courts found that a refusal to comply constitutes a failure to exhaust, *see, e.g.*, *Hunter v. Met. Life Ins. Co*, 251 F. Supp. 2d 107, 111–12 (D.D.C. 2003), in this case Defendant is estopped from making such a claim.

As discussed for purposes of the initial claim denial, the evidence in the administrative record strongly supports Plaintiff's claim of disability. Since the new evidence introduced on appeal does not undermine the overwhelming evidence of Plaintiff's disability, the Court is left with the definite and firm conviction that Plaintiff's claim was wrongly denied. In light of this, the Court finds that Defendant abused its discretion when denying Plaintiff's claim, both on the initial review and on appeal. As such, Defendant's motion for summary judgment is **DENIED** and Plaintiff's motion for summary judgment is **GRANTED**.

//

//

//

**CONCLUSION**

For the reasons stated, Plaintiff's motion for summary judgment is **GRANTED** and Defendant's motion for summary judgment is **DENIED**. Plaintiff **SHALL FILE** a supplemental memorandum addressing the proper measure of damages in this case by January 8, 2010. Defendant **MAY FILE** a response by January 29, 2010 and Plaintiff **MAY FILE** a reply by February 5, 2010. If the parties can agree to a joint stipulation as to the proper measure of damages, the Court will accept that in lieu of the above briefing if filed by January 8, 2010.

IT IS SO ORDERED.

DATED: December 4, 2009

*Janis L. Sammartino*
Honorable Janis L. Sammartino
United States District Judge